UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   08-60284-CR-MARRA

UNITED STATES OF AMERICA,

vs.

KEVIN D. FRANKEL,

      Defendant.
_____/

**GOVERNMENT'S RESPONSE OPPOSING
THE DEFENDANT'S 18 U.S.C. §3582(c)(2) MOTION TO MODIFY SENTENCE**

The United States of America, by and through the undersigned Assistant United States Attorney for the Southern District of Florida, files this response opposing the defendant's motion brought pursuant to Title 18, United States Code, Section 3582(c)(2):

I.    AMENDMENT 782 APPLIES TO THE DEFENDANT.  HOWEVER, THE SENTENCE THE DEFENDANT RECEIVED IS LOWER THAN THE SENTENCE CALCULATED UNDER THE NEW DRUG TABLE BECAUSE OF THE DOWNWARD VARIANCE GRANTED BY THE COURT AT SENTENCING.

**COURSE OF PROCEEDINGS AND DISPOSITION**

The defendant was arrested on or about June 21, 2008, and charged in a criminal complaint with attempting to possess with intent to distribute 50 kilograms of cocaine, in violation of Title 21, U.S.C. § 846.

On or about September 30, 2008, the United States Attorney's Office filed a one-count Information charging the defendant and three others with attempting to possess with intent to distribute 50 kilograms of cocaine, in violation of Title 21, U.S.C. § 846.

On or about December 5, 2008, the defendant pled guilty to the one-count Information and

[1]

the Court ordered that the United States Probation Office prepare a presentence investigation report (PSI) with respect to the defendant. The PSI prepared by the United States Probation Office, as revised on February 10, 2009, reflected a sentencing guideline range for the defendant of 135 - 168 months. The defendant's offense level set forth in the PSI for 50 kilograms of cocaine was level 36. The defendant's total offense level was level 33 and the defendant was in a Criminal History Category I.

On or about April 2, 2009, the defendant was sentenced by this Court. The defendant received a downward variance from the sentencing guideline range of 135 - 168 months, and received a term of imprisonment of 100 months' imprisonment.

The defendant waived his right to appeal by not filing a notice with the Eleventh Circuit Court of Appeals.

## STATEMENT OF FACTS

At all times relevant to the time frame set forth in the Information, the defendant was employed by the Broward Sheriff's Office (BSO) as a sworn deputy sheriff. In or about September 2007 the FBI began an investigation of co-defendant RICHARD TAUBER (TAUBER). During the course of the investigation a confidential source (CS) introduced TAUBER to an FBI Agent acting in an undercover capacity (UCA-1), and UCA-1 introduced TAUBER to two other FBI agents acting in undercover capacities (UCAs 2 and 3).

UCA-1 was initially introduced to TAUBER as an individual who was associated with organized criminal activity in the South Florida and New York areas. The criminal activity included, but was not limited to, drug distribution. UCA-2 was introduced to TAUBER as "Big Tony," a high ranking member of an organized criminal group. TAUBER was informed that UCA-2's criminal organization was based out of the New York/New Jersey area. UCA-3 was

introduced to TAUBER as a successful Colombian drug distributor whose organization was operated out of Miami.

In consensually recorded discussions and meetings between the UCAs and TAUBER, it was discussed that the UCAs were interested in securing the services of TAUBER for their criminal activities due to his value as a police officer. TAUBER discussed with UCA-1 utilizing other law enforcement officers to assist UCA-1 in his criminal enterprise. On a number of occasions TAUBER mentioned FRANKEL, whom he referred to as "Tattoo," as a police officer who was willing to engage in criminal activities.

On April 5, 2008, TAUBER, co-defendant BACCARI (BACCARI), and co-defendant PROVENZANO (PROVENZANO) had a consensually recorded meeting with UCA-1, UCA-2, and the CS in Atlantic City, New Jersey. In discussing a potential drug transportation TAUBER told the UCAs and the CS that the gates at Pompano Airport are locked at 8:30 or 9:00 p.m., and that he was trying to get the code for the locks. TAUBER said the best time to do the drug delivery would be during the shift change for the police, which would be 2:30-3:30p.m. The CS told TAUBER that he (CS) was paying more (for the drug transportation) to TAUBER than to the others as TAUBER was more valuable because he is a police officer. BACCARI responded by saying that TAUBER is his "get out of jail ticket."

On April 14, 2008, TAUBER, BACCARI, and PROVENZANO had a consensually recorded meeting in Miami Beach with UCA-2 and the CS. The CS told TAUBER, BACCARI, and PROVENZANO that he (CS) wanted to bring up north 50 "keys." UCA-2 said that they had a connection in Harlem with some "Dominican guys." They all discussed a plan to deliver "the product" (drugs) from Miami to Pompano Beach Municipal Airport. The CS said that TAUBER will get $10,000 and BACCARI and PROVENZANO will get $5,000 for the drug transportation,

because TAUBER is more valuable due to his "badge."  They all agreed to do the (drug) transportation on Friday, April 18, 2008.

On April 18, 2008, TAUBER, BACCARI, and PROVENZANO had a consensually recorded meeting with the UCAs and the CS at a warehouse in Miami.  In the presence of TAUBER, BACCARI, and PROVENZANO, UCA-2 opened two suitcases that each contained 25 kilos of sham cocaine and asked the defendants if they wanted to count the kilos, which offer they declined.  TAUBER told everyone to watch for one white and one black SUV, which would indicate undercover police.  Before leaving the warehouse UCA-1 told TAUBER, BACCARI, and PROVENZANO to be careful because "two suitcases full of coke" is a big deal.  TAUBER, BACCARI, and PROVENZANO responded in the affirmative.  BACCARI and PROVENZANO drove with the two suitcases to the Pompano Airport with TAUBER following behind them.  TAUBER brought walkie-talkies for them to communicate.  They arrived at the Pompano Airport at 2:30p.m.  The time suggested by TAUBER was the time for the police to make a shift change.  Consistent with prior arrangement, BACCARI and PROVENZANO left the car near the airport runway, and UCA-1 and another undercover agent took the suitcases from the car to the airplane.  TAUBER, BACCARI, and PROVENZANO waited until the purported 50 kilograms of cocaine were loaded on an aircraft, taxied onto a runway, and took off.

On April 18, 2008, while TAUBER, BACCARI, and PROVENZANO were picking up the purported cocaine from the UCAs at the warehouse in Miami, a marked Deerfield Beach BSO police car was surveilled by law enforcement officers traveling around the perimeter of the Pompano Beach Municipal Airport.  The Deerfield Beach patrol car appeared to be engaged in counter surveillance activities.  It was later confirmed that FRANKEL had driven the patrol car.

From approximately 6:43 p.m. through 7:30 p.m., on April 18, 2008, the UCAs, TAUBER,

BACCARI, and PROVENZANO met at a hotel in Broward County where TAUBER was paid $10,000 and BACCARI and PROVENZANO were paid $5,000 each. At approximately 7:42 p.m., twelve minutes after TAUBER was paid by the UCA and departed the meeting, TAUBER called FRANKEL'S cellular telephone utilizing a pre-paid cellular telephone.

On June 18, 2008, TAUBER was arrested and agreed to cooperate. TAUBER stated that FRANKEL had, in fact, provided counter surveillance for the drug transportation on April 18, 2008, by driving his marked Deerfield Beach police cruiser around the perimeter of the Pompano Beach Municipal Airport. TAUBER stated that shortly after TAUBER was paid $10,000 by the UCAs, TAUBER met FRANKEL and TAUBER paid FRANKEL $3,000 for conducting counter surveillance activities. TAUBER stated that FRANKEL was aware that the transportation had involved 50 kilograms of cocaine.

On June 18 and 19, 2008, TAUBER consensually recorded conversations with FRANKEL during which FRANKEL confirmed his participation in the April 18, 2008 transportation of 50 kilograms of purported cocaine.

**ARGUMENT**

I.  AMENDMENT 782 APPLIES TO THE DEFENDANT. HOWEVER, THE SENTENCE THE DEFENDANT RECEIVED IS LOWER THAN THE SENTENCE CALCULATED UNDER THE NEW DRUG TABLE BECAUSE OF THE DOWNWARD VARIANCE GRANTED BY THE COURT AT SENTENCING.

Title 18, United States Code, Section 3582(c)(2) "establishes a two-step inquiry. A court must first determine that a reduction is consistent with USSG § 1B1.10 before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)." *Dillon v. United States*, 560 U.S. 817, 826 (2010).

The defendant is eligible for the relief sought pursuant to Amendment 782 if the amended

advisory USSG range is lower than the range applied at the original sentencing hearing, and if the defendant did not already receive a sentence lower than the amended range on any ground other than substantial assistance. If a defendant is eligible, the court must exercise its discretion to determine whether to grant a sentencing reduction and to what extent within the limit allowed by USSG § 1B1.10. The extent of the permissible reduction is restricted. Congress delegated to the Sentencing Commission the authority to determine to what extent a sentence may be reduced. *See* 18 U.S.C. § 3582(c)(2); 28 U.S.C. § 994(u); *Dillon v. United States*, 560 U.S. 817, 826 (2010). "Subsection 1B1.10(b)(2)'s limitation on a district court's sentence-reduction authority is absolute." *United States v. Jackson,* 751 F.3d 707, 711 (6th Cir. 2014). The extent of the permissible reduction is strictly limited to two levels. The government may oppose relief for an eligible defendant based on specific and compelling circumstances regarding the nature of the offense and the offender.

The defendant is correct that Amendment 782 reduced the guideline range applicable in his case. However, the 100 months' prison term previously imposed by the Court after granting a downward variance is less than the sentence calculated by the new drug table. Specifically, the base offense level in this case is now 34, pursuant to USSG § 2D1.1 as amended by Amendment 782, made retroactive by USSG § 1B1.10(d). When combined with the other guideline applications made earlier, as required by USSG § 1B1.10(b)(1), the final offense level is 31. At the established criminal history category of I this would result in a USSG advisory sentencing range of 108 - 135 months' imprisonment. This is a reduction from the previously applied USSG sentencing range of 135 – 168 months' imprisonment but greater than the 100 months' term of imprisonment imposed.

The extent of the sentencing reduction in this case is limited to the bottom of the amended guideline range, notwithstanding the fact that the defendant in the original sentencing received a below-guideline sentence on the basis of a downward variance.  In the version of Section 1B1.10 in effect prior to November 1, 2011, the Sentencing Commission provided that a person who received a downward departure or variance in the original guideline calculation was eligible for a comparable reduction below the amended range.  Effective November 1, 2011, however, the Sentencing Commission made a significant change, decreeing that only a defendant who received a downward departure based on cooperation may obtain a reduction below the amended range.

Therefore, the United States of America opposes a further reduction of the defendant's sentence based on the drug table revisions contained in Amendment 782.  The reasons stated by the Court at sentencing to justify the sentence of 100 months' imprisonment was that "there is a need for a significant period of incarceration to reflect the seriousness of the offense, promote respect for the law and provide just punishment.   There's also a need for a significant

incarcerative sentence to avoid (sic-'afford') adequate deterrence to criminal conduct." (DE 149 at pg. 42).   The reasons for the Court's imposition of the 100 months' term of incarceration remain unchanged as should the sentence.

          Respectfully submitted,

          WIFREDO A. FERRER
          UNITED STATES ATTORNEY

By:    Jeffrey N. Kaplan
       JEFFREY N. KAPLAN
       ASSISTANT UNITED STATES ATTORNEY
       Court Number A5500030
       500 East Broward Boulevard, Suite 700
       Fort Lauderdale, Florida   33394
       Tel. (954) 660-5695
       Fax. (954) 356-7230

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of December 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and mailed a copy to the defendant Kevin Frankel, Inmate Number 80658-004, FCI Memphis-Satellite Camp, P.O. Box 2000, Millington, TN 38083.

          Jeffrey N. Kaplan
          JEFFREY N. KAPLAN
          ASSISTANT UNITED STATES ATTORNEY